IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATHAN B.,[1]                                                Case No. 2:18-cv-01408-SB

               Plaintiff,                              **OPINION AND ORDER**

         v.

ANDREW M. SAUL, Commissioner of Social
Security,

               Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Nathan B. ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of his applications for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act,

42 U.S.C. §§ 401-34, 1381-83f. The Court has jurisdiction under 42 U.S.C. §§ 405(g) and

1383(c)(3). For the reasons explained below, the Court reverses the Commissioner's decision

and remands this case for further proceedings consistent with this opinion.

_____

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case. When applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

## BACKGROUND

Plaintiff was born in June 1977, making him thirty-seven years old on August 23, 2013, the alleged disability onset date. (Tr. 25, 67.) Plaintiff has a tenth-grade education and past relevant work as an automobile mechanic helper and construction worker. (Tr. 25, 214.) In his applications, Plaintiff alleges disability because of depression, dyslexia, and a back injury. (Tr. 67.)

On July 26, 2013, one month before the alleged onset date, a magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine revealed "[m]ulti-level degenerative disk space disease with varying amounts of spinal canal and neural foraminal narrowing, most significant at L5-S1." (Tr. 295.)

On October 10, 2013, Plaintiff's rehabilitation counselor referred him to David Bush, Ph.D. ("Dr. Bush"), for a psychological evaluation. Dr. Bush interviewed Plaintiff and administered a battery of tests. Dr. Bush determined that Plaintiff "reads at a second-grade level and is functionally illiterate," Plaintiff "does not meet the criteria for an attention problem," Plaintiff has "struggled to maintain employment, in part because of learning challenges," Plaintiff's "primary concern is processing speed," and Plaintiff's "severe reading and writing delays are consistent with major learning disorder." (Tr. 397-98.) Dr. Bush diagnosed Plaintiff with a reading disorder and disorder of written language. Dr. Bush added that Plaintiff "needs work that doesn't require reading or writing and limited math," Plaintiff "needs a supportive employer or supervisor who understands learning deficits and [Plaintiff's] slower processing speed," and Plaintiff "would [do] best in a position that does not require a great deal of speed." (Tr. 399.)

On April 23, 2014, Plaintiff visited Stuart King, M.D. ("Dr. King"), a physiatrist, complaining of "acute low back pain and sciatica." (Tr. 377.) Plaintiff reported that he had "not

been able to return to work with his back problems," he "had some jobs but when they discovered he had a back injury he was let go or not hired in the first place," he was "working with vocational rehabilitation toward becoming a security guard" and obtaining his General Equivalency Degree, and he was recently released "to occasional 75-pound lifts." (Tr. 377.) Dr. King noted that Plaintiff did not complain of anxiety or depression, Plaintiff's Patrick's test was "positive for right sacroiliac joint pain and no hip joint contractures bilaterally," Plaintiff "react[ed] to straight leg raise on the right not the left," and Plaintiff exhibited "[g]reatly decreased lumbar range of motion with guarding."[2] (Tr. 377-78.) Dr. King diagnosed Plaintiff with (1) "[a]cute lumbar disk herniation with low back pain and sciatica," (2) "[v]ery little evidence of lumbar strain," and (3) "[s]acroilitis right worse than left." (Tr. 378.) Dr. King added that he would "need the MRI scan and reports . . . to confirm concerns with disk herniation," and that he could not release Plaintiff to work because he "may be at significant risk of reinjuring and worsening and having surgery he could've avoided with proper precautions and care." (Tr. 378-79.)

On January 28, 2015, Irmgard Friedburg, Ph.D. ("Dr. Friedburg"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 71-72.) Based on her review of Plaintiff's medical records, Dr. Friedburg determined that Plaintiff's mental impairments did "not precisely satisfy" the criteria of listing 12.04 (affective disorders). (Tr. 71-72.)

On January 29, 2015, Susan Moner, M.D. ("Dr. Moner"), a non-examining state agency physician, completed a physical residual functional capacity assessment. (Tr. 73-74.) Dr. Moner

---

[2] "Patrick's test is used to determine the presence or absence of sacroiliac disease." *Triunfel v. Barnhart*, No. 06-10215, 2006 WL 3469623, at *2 n.5 (D. Mass. Dec. 1, 2006) (citation omitted).

determined that Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently, and sit, stand, and walk for about six hours in an eight-hour workday. Dr. Moner added that Plaintiff can (1) push and pull in accordance with his lifting and carrying restrictions, (2) occasionally crawl and climb ramps, stairs, ladders, ropes, and scaffolds, (3) frequently stoop, kneel, and crouch, and (4) balance without limitation. In addition, Dr. Moner concluded that Plaintiff does not suffer from any manipulative, visual, communicative, or environmental limitations.

On April 7, 2015, Neal Berner, M.D. ("Dr. Berner"), a non-examining state agency physician, completed a physical residual capacity assessment and made findings identical to Dr. Moner's findings. (Tr. 93-95.)

On April 8, 2015, Winifred Ju, Ph.D. ("Dr. Ju"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 92.) Dr. Ju agreed with Dr. Friedburg that Plaintiff's mental impairments failed to meet or equal listing 12.04 (affective disorders).

On December 30, 2015, Plaintiff visited Stephanie Parker ("Parker"), a licensed professional counselor. Plaintiff reported that he recently visited the emergency room because of increased paranoia and hallucinations. (Tr. 409.) Plaintiff also reported that he had been "depressed most of his life," he visited Parker to "make sure he is not crazy and not delusional," he had a long-term history of "smoking recreational marijuana, which he gets from friends and does not know [the] origin," and his mother had "'paranoid schizophrenia' and killed his brother before drowning herself." (Tr. 409-12.) Parker noted that Plaintiff suffers from "difficulty sleeping at night, low energy, low self-esteem, and difficulty making decisions," which cause "significant distress or impairments socially, occupationally, and in family relationships" and are

not attributable to Plaintiff's "cannabis use or explained by any psychotic disorder, including

schizophrenia." (Tr. 413.) Parker also noted that Plaintiff "spends significant time obtaining

cannabis from various friends" and Plaintiff "continues to smoke cannabis," even though he had

been "experiencing increased panic, paranoia and hallucinations . . . intermittently [for] about 3

months and after he smokes cannabis." (Tr. 413.) Parker's primary diagnoses were (1) persistent

depressive disorder "with anxious distress," and (2) a "moderate" cannabis use disorder.

(Tr. 413.)

On August 24, 2016, Plaintiff's primary counselor, Peter Buhmann ("Buhmann"),

referred him to William Herz, M.D. ("Dr. Herz"), for a psychiatric evaluation. Dr. Herz noted

that he reviewed some of Plaintiff's mental health records, Plaintiff has a "significant family

history" of mental illness, and Plaintiff complained of paranoia, delusions, and possible

hallucinations. Dr. Herz also addressed the relationship between Plaintiff's marijuana use and

schizophrenia:

> It is possible that the use of Cannabis did contribute to the onset of
> the Schizophrenic symptoms, but the causal relationship between
> use of Cannabis and Schizophrenia is not well understood at all,
> and . . . it is also likely that the onset of Schizophrenia in a person
> predisposed to it could happen at any time regardless of whether
> Cannabis was used or not. . . . [H]e and his wife are both very
> much in agreement that he should not continue to use it if only
> because it could very likely exacerbate the symptoms. It is also
> possible that after a long enough period of abstinence from
> Cannabis, the Schizophrenic symptoms may significantly improve,
> but this is impossible to predict.

(Tr. 434.) Ultimately, Dr. Herz concluded that Plaintiff meets the criteria for a schizophrenia

diagnosis:

> Based on the history provided, as well as acknowledging that he
> does have what appear to be auditory hallucinations and a strong
> family history of Schizophrenia, it unfortunately appears he does
> have a high risk of having Schizophrenia. He has symptoms that
> meet the criteria of Schizophrenia, and the condition has not

persisted more than six months, which is beyond the duration of the criteria for Schizophreniform Disorder. Because of the presence of hallucinations as well as delusions, and some possible negative symptoms such as decreased emotional expression, I believe he actually does meet the criteria for Schizophrenia now. . . . [T]here are increasing reports in literature that Schizophrenic symptoms can begin first onset at almost any point in the lifespan. There also do not appear to be any other factors such as substance use [or] medical conditions that would account for the symptoms.

(Tr. 435-36.)

In a progress note dated January 5, 2017, Dr. Herz noted that Plaintiff was not using marijuana and that Plaintiff continued to suffer from symptoms of schizophrenia, such as auditory hallucinations and "having feelings of things not being real." (Tr. 438.) Dr. Herz also noted that it did "appear" that Plaintiff's marijuana use was "the initial trigger to set off his psychosis," and that he believes Plaintiff is "in early or mild form of Schizophrenia, with a lot of understanding of reality even though the symptoms he experiences are separated from it." (Tr. 438-39.)

On March 3, 2017, Plaintiff's counselor, Buhmann, filled out a questionnaire prepared by Plaintiff's counsel. (Tr. 441-44.) Buhmann reported that he treated Plaintiff fourteen times since July 6, 2016, he and Dr. Herz diagnosed Plaintiff with schizophrenia, and Plaintiff's symptoms include delusions and anxiety. Buhmann opined that Plaintiff is extremely limited in his ability to (1) ignore or avoid distractions while working, (2) work "a full day without needing more than the allotted number or length of rest periods during the day," and (3) keep "social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." (Tr. 443.) Buhmann also opined that Plaintiff would "miss . . . the equivalent of two full workdays . . . or more per month from even a simple, routine job because of his impairments, symptoms, or medications and their side effects." (Tr. 444.) Dr. Herz signed the questionnaire and stated that

he "concur[s] completely with the findings," which are "consistent" with his own observations. (Tr. 444.)

On April 3, 2017, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 37-64.) Plaintiff testified that his back pain is exacerbated by driving and standing too long, and he cannot "lift very much weight" or "bend[] over a car all day" because of the "bad discs in [his] back." (Tr. 41-42, 47-48.) Plaintiff added that he suffers from mental health issues, his mother was mentally ill and killed herself and his brother, he does not "want to hurt anybody," he instructed his wife "to call the cops or whatever" if he starts "acting too weird," he visits his counselor once or twice a month, his counselor is trying to find a medication that will make him "more stable," he cannot "lift more than 50 pounds," he experiences pain when he lifts household objects, such as "a couple gallons of milk," and he takes mental health medication daily but does not take pain medication because he does not "want to get addicted to pills." (Tr. 48-50.) Plaintiff also testified that he attended community college in 2015 and attempted to earn his General Equivalency Degree, although he does not "remember . . . even going" to community college due to his psychosis, and he only remembers being "in a house and people wouldn't let [him] leave and they were interrogating [him] and had [him] tied up and stuff." (Tr. 51-52.)

The ALJ posed several hypothetical questions to a Vocational Expert ("VE") who testified at Plaintiff's hearing. First, the ALJ asked the VE to assume that a hypothetical worker of Plaintiff's age, education, and work experience could perform the "full range of light exertion work," subject to the following limitation: Plaintiff can engage in no more than occasional crawling and climbing of ramps, stairs, ladders, ropes, and scaffolds. (Tr. 60.) The VE testified that the hypothetical worker could not perform Plaintiff's past work, but the worker could be

employed as a "cleaner housekeeping," cafeteria attendant, and small products assembler. (Tr. 61.)

Second, the ALJ asked the VE to assume that the hypothetical worker described above also needed to be limited to "simple, routine tasks requiring a reasoning level of one or two." (Tr. 61.) The VE testified that the hypothetical worker could not perform Plaintiff's past work, but the worker could still perform the jobs the VE identified in response to the first hypothetical. (Tr. 61-62.)

Responding to the third and final hypothetical, the VE confirmed that a hypothetical worker could not sustain gainful employment if he needed "reminders once per hour in order to stay on task." (Tr. 62.) Responding to Plaintiff's counsel's hypothetical questions, the VE confirmed that a hypothetical worker could not sustain gainful employment if (1) he was off task fifteen to twenty percent of the time, or (2) missed sixteen hours of work "per month on average on an ongoing basis" because of absences, leaving work early, or arriving late to work. (Tr. 62-63.)

In a written decision issued on June 21, 2017, the ALJ applied the five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), and found that Plaintiff was not disabled. *See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed.

## THE FIVE-STEP DISABILITY ANALYSIS

### I.    LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42

U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 15-26.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 23, 2013, the alleged disability onset date. (Tr. 17.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairment: degenerative disc disease of the spine and schizophrenia. (Tr. 17.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment.

(Tr. 18.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to the following limitations: (1) Plaintiff needs to be limited to "simple, routine tasks requiring a reasoning level of 1 or 2," and (2) Plaintiff needs to be limited to no more than occasional crawling and climbing of ramps, stairs, ladders, ropes, and scaffolds. (Tr. 19.) At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work. (Tr. 25.) At step five, the ALJ concluded that Plaintiff was not disabled because a significant number of jobs existed in the national economy that he could perform, including work as a (1) "cleaner, housekeeping," (2) cafeteria assistant, and (3) small products assembler. (Tr. 26.)

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the

judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) improperly rejecting the opinions of Plaintiff's medical sources; (2) failing to find that Plaintiff's dyslexia/learning disability, attention deficit hyperactivity disorder ("ADHD"), depressive disorder, and anxiety disorder were severe impairments at step two; (3) finding that Plaintiff did not meet the requirements of listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (affective disorders), and 12.06 (anxiety related disorders); and (4) failing to provide clear and convincing reasons for discounting Plaintiff's testimony. As explained below, the Court finds that the Commissioner's decision is based on harmful legal error and not supported by substantial evidence. The Court therefore reverses the Commissioner's decision and remands this case for further proceedings consistent with this opinion.

## I.    MEDICAL OPINION EVIDENCE

### A.    Applicable Law

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (citation omitted). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citation omitted).

**B.      Analysis**

**1.      Dr. Herz and Buhmann**

Plaintiff argues that the ALJ improperly rejected the opinions of his treating psychiatrist, Dr. Herz, and counselor, Buhmann. Specifically, Plaintiff argues that the ALJ should have credited the findings in the questionnaire that Buhmann filled out because Dr. Herz and Buhmann formed an "interdisciplinary team," and Dr. Herz signed the questionnaire and stated that he "concur[red] completely" with Buhmann's findings and found the findings consistent with Plaintiff's presentation during his four treatment sessions with Dr. Herz.[3] (Pl.'s Reply at 1-2, citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996), and 20 C.F.R. § 416.913(a)(6)). The Commissioner responds that Buhmann is not an acceptable medical source and that the ALJ did

---

[3] The record reflects that Dr. Herz and Buhmann worked at the same mental health clinic. (*See* Ct. Tr. Index at 3, reflecting that Dr. Herz's and Buhmann's records came from the same clinic).

not need to consider Buhmann's opinion as part of Dr. Herz's opinion, citing the Ninth Circuit's unpublished decision in *Fernandez v. Barnhart*, 68 F. App'x 820 (9th Cir. 2003).[4]

### a.  Acceptable or Other Medical Source Opinion

The opinion of a counselor, such as Buhmann, usually qualifies as an "other" medical source. *See Haagenson v. Colvin*, 656 F. App'x 800, 802 (9th Cir. 2016) (stating that a counselor constitutes an "other" medical source and that Social Security regulations presume that counselors are non-acceptable medical sources). An ALJ can typically discount an "other" medical source's opinion if he "'gives reasons germane to each witness for doing so.'" *Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015) (quoting *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)).

The Ninth Circuit, however, has held that under certain circumstances, an "other" medical source's opinion may be considered part of an "acceptable" medical source's opinion. In *Gomez*, for example, the Ninth Circuit recognized that the other medical source, a nurse practitioner, consulted with a physician several times over the course of her relationship with the plaintiff, worked closely under the supervision of the physician, and acted as an agent of the

---

[4] The Commissioner asserts that he cited *Fernandez* in accordance with Fed. R. App. P. 32.1. (*See* Def.'s Br. at 5 n.2, 7 n.3, reflecting that the Commissioner mistakenly referred to the rule as Ninth Circuit Rule "32[-]1," which addresses the length and form of briefs and certificates of compliance). Federal Rule of Appellate Procedure 32.1 provides only that a court may not prohibit or restrict the citation of federal judicial opinions that were issued on or after January 1, 2007 and designated as not for publication. Fed. R. App. P. 32.1. "Ninth Circuit Rule 36-3 [also] prohibits parties from citing "[u]npublished dispositions . . . of [the Ninth Circuit] issued before January 1, 2007 . . . to the courts of this circuit." *In re The Vill. at Lakeridge, LLC*, 814 F.3d 993, 1001 n.10 (9th Cir. 2016). Thus, the applicable rules prohibit the Commissioner from citing *Fernandez*, and the Court is not bound by the opinion. *See id.* ("U.S. Bank should not have relied upon, or cited, [an unpublished 1996 decision] in its arguments, and we are not bound by the decision."). Even if that were not the case, *Fernandez* is factually distinguishable because it did not address a situation like the one presented here, where, as explained further below, an acceptable medical source endorses an "other" medical source's opinion. *See Fernandez*, 68 F. App'x at 820.

physician in her relationship with the plaintiff. 74 F.3d at 971. The Ninth Circuit therefore held that the nurse practitioner's opinion was "properly considered as part" of the physician's opinion. *Id.* In so holding, the Ninth Circuit relied in part on 20 C.F.R. § 416.913(a)(6), which provided that "[a] report of an *interdisciplinary team* that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence." 74 F.3d at 971 (emphasis added).

A few years after the Ninth Circuit issued the *Gomez* decision, "the Social Security Administration repealed 20 C.F.R. § 416.913(a)(6), stating that 'it is redundant and somewhat misleading to provide that an interdisciplinary team report containing the evaluation and signature of an acceptable source is such a source.'" *Jill C. v. Berryhill*, No. 3:17-cv-01892-SI, 2018 WL 6308728, at *8 (D. Or. Dec. 3, 2018) (citation omitted). Although § 416.913(a)(6) has now been repealed, the Ninth Circuit has observed that the *Gomez* decision only "relied in part on language" from this regulation. *Molina*, 674 F.3d at 1111 n.3. Furthermore, although the Ninth Circuit has declined to address the validity of *Gomez* in light of the repeal of § 416.913(a)(6), *see, e.g.*, *Britton*, 787 F.3d at 1013 n.4 ("*Gomez* partially relied on 20 C.F.R. § 416.913(a)(6), which has been repealed. . . . We express no view on the validity of *Gomez*."), the Ninth Circuit has "continued to cite *Gomez* and apply the exception to the 'acceptable medical sources' definition long after the repeal of § 416.913(a)(6)." *Jill C.*, 2018 WL 6308728, at *8 (citing *Taylor v. Comm'r of Soc. Sec.*, 659 F.3d 1228, 1234 (9th Cir. 2011)). Courts have therefore held that "*Gomez* continues to set forth the law of the Ninth Circuit." *Id.* (citation and quotation marks omitted).

The district court's decisions in *Jill C.* and *Michelle Ann H. v. Comm'r of Soc. Sec.*, No. 18-cv-003-FVS, 2019 WL 943395, at *8 (E.D. Wash. Feb. 26, 2019), are instructive on how to

apply *Gomez* and its progeny. In *Jill C.*, a nurse, who treated the plaintiff several times and served as her primary care provider, filled out and signed a physical capacity statement and a physician signed the statement three months later. 2018 WL 6308728, at *8. The physician's name appeared only on the physical capacity statement she cosigned and there was no evidence of conferrals between the nurse and physician. *Id.* The record evidence also failed to reflect that the physician was present at any examinations or that the nurse worked as the physician's agent. *Id.* Further, the record evidence failed to reflect that the nurse worked under the close supervision of the physician. *Id.* The district court therefore rejected the plaintiff's argument that the nurse and physician were part of an interdisciplinary team, noting that the record failed to "provide any insight" about the supervisory relationship between the "relevant parties," and that the physician's signature alone failed to establish that the nurse worked under the physician's "close supervision." *Id.* (citations omitted). As a result, the district court declined to consider the nurse an "acceptable medical source" and analyzed her opinion as an "other" medical source that may be rejected for germane reasons. *Id.*

By contrast, in *Michelle Ann H.*, the district court treated a nurse practitioner's opinion as that of a treating physician. 2019 WL 943395, at *8. In that case, the plaintiff's treating nurse practitioner and physician cosigned a medical source statement. *Id.* The ALJ assigned little weight to the nurse practitioner and physician's opinions in the medical source statement, noting that the Social Security regulations provide that a nurse practitioner is "not considered an 'acceptable medical source' . . . and is not entitled to controlling weight." *Id.* The district court noted that the ALJ appeared to consider the medical source statement as an opinion from "a non-acceptable medical source which could be rejected for germane reasons." *Id.* Recognizing that the physician cosigned the opinion and the ALJ acknowledged that the opinion was "endorsed"

by the physician, the district court held that the medical source statement was "the opinion of a treating physician and [was] entitled to the deference and consideration accorded to the opinion of an acceptable medical source." *Id.* Thus, the district court treated the medical source statement as an opinion from a treating physician and reviewed it under the specific and legitimate reasons standard since another physician disagreed with it. *Id.*

Here, the record suggests that Buhmann's opinion should be considered part of Dr. Herz's opinion. Indeed, the record reflects that (1) the ALJ acknowledged that Dr. Herz "concurred" with Buhmann's opinion, (2) Dr. Herz and Buhmann worked at the same mental health clinic, (3) Dr. Herz treated Plaintiff four times and Buhmann treated Plaintiff fourteen times, (4) Dr. Herz's "[i]nterventions and [p]lans" for Plaintiff included continued individual therapy and case management work with Buhmann, (5) Dr. Herz's treatment records refer to Buhmann as Plaintiff's primary therapist/counselor and to a consulting relationship between Dr. Herz and Buhmann, and (6) Dr. Herz reviewed Buhmann's questionnaire and stated that he "concur[red] completely" with Buhman's findings and found them consistent with Plaintiff's presentation during Dr. Herz's treatment sessions. (Ct. Tr. Index at 3; Tr. 24, 432, 437-38, 440, 441, 444.) Under these circumstances, the Court finds that Buhman's opinion is part of Dr. Herz's opinion and that the ALJ was required to provide specific and legitimate reasons to reject it.[5]

### b.       Reasons to Discount the Opinion

Dr. Herz and Buhmann reported that Plaintiff suffers from schizophrenia and, as a result, Plaintiff is extremely limited in his ability to (1) ignore or avoid distractions while working, (2)

---

[5] Plaintiff acknowledges that the ALJ needed to provide specific and legitimate reasons, not clear and convincing reasons, for rejecting Dr. Herz's and Buhmann's opinion. (Pl.'s Opening Br. at 12.)

work "a full day without needing more than the allotted number or length of rest periods during the day," and (3) keep "social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." (Tr. 443.) Dr. Herz and Buhmann also opined that Plaintiff would miss "the equivalent of two full workdays . . . or more per month from even a simple, routine job because of his impairments, symptoms, or medications and their side effects." (Tr. 444.)

The ALJ assigned only "partial weight" to Dr. Herz and Buhmann's opinion because it "relie[d] heavily" on Plaintiff's "self-reports with little specific objective clinical findings." (Tr. 24.) The Court finds that the ALJ erred in discounting Dr. Herz and Buhmann's opinion on this ground.

The Ninth Circuit has explained that "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). Indeed, although psychiatric evaluations often "appear subjective" when compared to "evaluation in other medical fields," psychiatric diagnoses "depend in part on the patient's self-report, as well as on the clinician's observations of the patient," because that is "the nature of psychiatry." *Id.* Consistent with these principles, the Ninth Circuit has held that it is improper to reject a physician's opinion based on its partial reliance on the patient's self-reports when the record reflects that the physician conducted a clinical interview and mental status evaluation, which are "objective measures [that] cannot be discounted as a 'self-report.'" *Id.* (explaining that "a mind cannot be x-rayed") (citation omitted).

As in *Buck*, the ALJ here failed to recognize that Dr. Herz conducted clinical interviews and mental status examinations and relied on his observations of Plaintiff. (*See* Tr. 432, 434-35, 438-39, 444, reflecting that Dr. Herz conducted clinical interviews and mental status

examinations and found Buhmann's findings consistent with his observations during treatment). Further, although the record does not include copies of Buhmann's counseling records, the questionnaire makes clear that Buhmann's findings were also based on his observations of Plaintiff.[6] (*See* Tr. 441-43, stating that Plaintiff presents with "disorganized speech and behavior" and an inability to "think and communicate in [a] simple and linear manner," and that Plaintiff "displays of thinking . . . in session" include anxiety and delusional and tangential thought processes). Thus, as in *Buck*, the ALJ erred in discounting Dr. Herz's and Buhmann's opinion based on its partial reliance on Plaintiff's self-reports, because the record reflects that Dr. Herz's opinion is based on objective evidence, such as clinical interviews and mental status examinations.

In sum, the ALJ should have treated Buhmann's opinion as part of Dr. Herz's opinion and evaluated Dr. Herz's opinion in light of the objective medical evidence on which he relied. The ALJ failed to do so. Consequently, the ALJ failed to satisfy the specific and legitimate reasons standard to discount Dr. Herz's and Buhmann's opinion.

### 2. Dr. Bush

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for discounting the opinion of his examining psychologist, Dr. Bush. (*See* Pl.'s Reply at 5, stating that the specific and legitimate reasons standard applies). Dr. Bush examined Plaintiff two months after the alleged disability onset date and administered tests. Dr. Bush determined that Plaintiff suffers from "severe reading and writing delays" that "are consistent with [a] major learning disorder," that Plaintiff is "functionally illiterate," and that Plaintiff needs "work that doesn't require reading or writing and limited math" and "a supportive employer or supervisor

---

[6] It is not clear why Buhmann's treatment records were not included in the underlying record.

who understands learning deficits and [Plaintiff's] slower processing speed." (Tr. 398-99.)

Dr. Bush also noted that Plaintiff needed his wife to read for him, it took Plaintiff "twice as long as normal" to complete his forms, and Plaintiff worked "painfully slow." (Tr. 396.)

The ALJ assigned "little weight" to Dr. Bush's opinion, on the grounds that Dr. Bush only saw Plaintiff once, made no mention of schizophrenia, and identified processing speed as Plaintiff's primary weakness, although only mildly impaired:

> The claimant's schizophrenic issues surfaced relatively recently. It seems this provider only saw the claimant once. It is notable that Dr. Bush, a psychologist, made no mention of schizophrenia at all in his report. It is significant that Dr. Bush noted that the claimant's primary weakness was processing speed, which was only mildly impaired. The claimant's mental condition is accommodated by the limitation to simple, routine tasks requiring a reasoning level of 1 or 2 in the residual functional capacity.

(Tr. 24.)

The Commissioner argues that the ALJ did not err in discounting Dr. Bush's opinion because (1) the ALJ accurately stated that Dr. Bush did not assess schizophrenia, and (2) the ALJ accepted and accounted for Dr. Bush's opinion by formulating an RFC that limited Plaintiff to work that involves simple, routine tasks requiring a reasoning level of one or two. (Def.'s Br. at 4-5.)

The Court finds that the ALJ failed to satisfy the specific and legitimate reasons standard. That Dr. Bush, an examining psychologist, "only saw" Plaintiff once is not a specific and legitimate reason for discounting Dr. Bush's opinion. *See, e.g.*, *John G. v. Berryhill*, No. 3:17-1076-AC, 2018 WL 3202000, at *3 (D. Or. June 28, 2018) ("This court agrees that a consultative examiner examining a claimant only one time is not a specific-and-legitimate reason to discount an examining doctor's medical opinion. If such a rationale were valid, an ALJ could summarily

reject virtually any consultative medical opinion, as the overwhelming majority of such opinions are derived from a single clinical visit.").

Furthermore, the record explains that Dr. Bush did not address schizophrenia because he was asked to focus on Plaintiff's learning delays, and Plaintiff's schizophrenia developed after Dr. Bush's exam. Indeed, the record reflects the following: (1) Dr. Bush was asked to conduct "[t]esting . . . to document learning delays" and thus focused on such testing during his exam, and (2) in his treatment records, Dr. Herz explained that Plaintiff has a "strong family" of schizophrenia and is therefore "predisposed" to and at a "high risk of having" schizophrenia, the onset of schizophrenia can "happen at any time" in "the lifespan," and as of August 2016 (i.e., nearly three years after Dr. Bush examined Plaintiff), Plaintiff's schizophrenia had "not persisted more than six months." (Tr. 395, 434-36; *see also* Tr. 413, reflecting that on December 30, 2015, Plaintiff reported that he had only been "experiencing increased panic, paranoia and hallucinations . . . intermittently [for] about 3 months"; Tr. 390, noting that a neuropsychologist stated in 2003 that Plaintiff has a "significant family psychiatric history" and declined to "mention the details"). Given this evidence and Dr. Bush's significant findings regarding Plaintiff's literacy, the ALJ erred in discounting Dr. Bush's opinion on the ground that he did not address Plaintiff's schizophrenia.

In light of the errors described above, the remaining issue to address is whether the ALJ nevertheless accounted for Dr. Bush's opinion in formulating Plaintiff's RFC. The Commissioner asserts that the ALJ adequately accounted for Dr. Bush's opinion by limiting Plaintiff to work that involves no more than simple, routine tasks requiring a reasoning level of one or two.

The Court finds that the ALJ failed to account for Dr. Bush's opinion because the jobs the ALJ identified as suitable for Plaintiff are not consistent with Dr. Bush's opinion. Dr. Bush opined that Plaintiff needs a job that does not require reading or writing, and the ALJ concluded that Plaintiff could work as a small products assembler, cafeteria assistant, and "cleaner, housekeeping." (Tr. 26.) These jobs all require the ability to "[r]ead at [a] rate of 95-120 words per minute" and write "simple sentences containing subject, verb, and object, and series of numbers, names, and addresses." Assembler, Small Products I, DOT 706-684-022, 1991 WL 679050; Cafeteria, Attendant, DOT 311.677-010, 1991 WL 672694; Cleaner, Housekeeping, DOT 323.687-014, 1991 WL 672783. Thus, the ALJ did not account for Dr. Bush's opinion at step five.

In sum, the ALJ failed to provide specific and legitimate reasons for discounting Dr. Bush's opinion.[7]

### 3.    Dr. King

Plaintiff argues that the ALJ failed to address the opinion of his examining physiatrist, Dr. King. Dr. King examined Plaintiff in connection with his worker's compensation claim and issued a report on April 23, 2014. Based on his exam and interview of Plaintiff, Dr. King determined that he could not release Plaintiff to work at that time, because he "may be at significant risk of reinjuring and worsening and having surgery he could've avoid with proper precautions and care." (Tr. 379.)

The ALJ did not address Dr. King's opinion or examination in his decision. The Commissioner does not dispute this point, but argues that the ALJ "appropriately evaluated"

---

[7] Given the Court's findings regarding Dr. Bush's and Dr. Herz's opinions, the Court agrees with Plaintiff that the ALJ erred at step five by formulating an RFC and VE hypothetical that failed to account for all of Plaintiff's limitations. (See Pl.'s Opening Br. at 19-20.)

Dr. King's opinion by discussing an April 2015 MRI, a July 2015 work release, and an October 2015 physical performance evaluation reflecting that Plaintiff's physical condition improved. (Def.'s Br. at 8.) The ALJ never gave these reasons or cited this evidence for rejecting Dr. King's opinion, and the Court is "'constrained to review [only] the reasons the ALJ asserts.'" *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (citation omitted); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (noting that ALJs "must consider all medical opinion evidence"). Accordingly, the ALJ erred by failing to address Dr. King's medical opinion evidence.

### 4.  Tami Pearce

Plaintiff argues that the ALJ improperly rejected the opinion of his treating nurse, Tami Pearce ("Pearce"). In support of this argument, Plaintiff notes that the ALJ ignored substantial evidence demonstrating that he suffers from a severe learning disorder and slow processing speed. (Pl.'s Opening Br. at 14.) The Court does not address whether the ALJ erred in discounting Pearce's opinion because the Court has already determined that the ALJ erred in rejecting Dr. Bush's opinion regarding Plaintiff's learning disorder, illiteracy, and processing speed and therefore the ALJ will address those same limitations on remand.

## II.  STEP TWO

Plaintiff next argues that the ALJ erred by failing to find that Plaintiff's dyslexia/learning disability, ADHD, depressive disorder, and anxiety disorder were severe impairments at step two. Plaintiff argues that the ALJ's step two error was harmful because the ALJ's RFC and VE hypothetical failed to account for, among other things, his reading and writing deficits. (Pl.'s Reply at 8.) The Court agrees that, given Dr. Bush's opinion, the ALJ step two error was harmful because the ALJ formulated an RFC and VE hypothetical that failed to account for all of Plaintiff's limitations. *See Rowe v. Berryhill*, No. 3:17-362-SB, 2018 WL 1001023, at *10 (D.

Or. Feb. 21, 2018) (explaining that a step two error is harmless only if "the ALJ accounts for any credible limitations posed by [an] impairment in formulating the RFC and VE hypothetical").

## III.    STEP THREE

Plaintiff also argues that the ALJ erred by finding that Plaintiff did not meet the requirements of listings 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (affective disorders), and 12.06 (anxiety related disorders). Plaintiff relies on Dr. Herz's and Dr. Bush's opinions to argue that he meets or equals a listed impairment. (Pl.'s Opening Br. at 16; Pl.'s Reply at 9.)

The Court need not address whether Dr. Herz's and Bush's opinions support a finding that Plaintiff meets or equals a listing because (1) Dr. Herz's opinion alone supports a finding of disability during the relevant period (*compare* Tr. 444, reflecting that Dr. Herz opined that Plaintiff would miss more than two full workdays a month, *with* Tr. 62-63, noting that the VE testified that an individual who missed "16 hours per month on average on an ongoing basis" could not sustain employment), and (2) further proceedings are necessary so that the ALJ can address when and for how long Plaintiff's physical and mental impairments prevented him from working.[8] (*See* Tr. 379, noting that a physiatrist declined to release Plaintiff to work several months after the onset date; Tr. 413, reflecting that in December 2015, Plaintiff had only been experiencing schizophrenic symptoms "intermittently [for] about 3 months"; Tr. 436, noting that Dr. Herz stated that as of August 2016, Plaintiff's schizophrenia had "not persisted more than six months"; Tr. 40-41, reflecting that Plaintiff's counsel informed the ALJ that Plaintiff "originally

---

[8] The record and the parties' briefs do not reveal whether any job would be suitable for Plaintiff given his reading and writing deficits. Assuming that such a job exists, the record suggests that Plaintiff's physical impairments may have prevented him from working for a period of time and that at some point thereafter, Plaintiff developed debilitating schizophrenia symptoms. As the citations below demonstrate, Plaintiff's counsel recognized as much at the hearing. The ALJ and Plaintiff's counsel can address these issues on remand.

filed []his application[s] due to a back injury, for which he filed a worker's comp claim,"
Plaintiff "does carry with him now a diagnosis of schizophrenia," and Plaintiff's counsel
"appreciate[d] that [Plaintiff's] mental health impairment exhibited at a later date than his
alleged onset date" and was willing to "submit a brief with a potential onset date for his mental
health").

## IV.    PLAINTIFF'S SYMPTOM TESTIMONY

Finally, Plaintiff argues that the ALJ failed to provide clear and convincing reasons for
discounting his symptom testimony. The Court declines to address this argument given the errors
described above and the need to remand this case to the ALJ for further proceedings. *See, e.g.*,
*Torrez v. Astrue*, No. 1:09-cv-00626, 2010 WL 2555847, at *10 (E.D. Cal. June 21, 2010)
("Plaintiff has also raised a claim that the ALJ erred in discounting her symptom
testimony. . . . In light of the Court's conclusion that this matter should be remanded . . . , the
Court believes any assessment of this issue is premature and declines to address it issue at this
time.").

## V.     REMEDY

"Generally when a court of appeals reverses an administrative determination, 'the proper
course, except in rare circumstances, is to remand to the agency for additional investigation or
explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted).
"Before [a court] may remand a case to the ALJ with instructions to award benefits, three
requirements must be met." *Burrell*, 775 F.3d at 1141. Those requirements are "'(1) the record
has been fully developed and further administrative proceedings would serve no useful purpose;
(2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether
claimant testimony or medical opinion; and (3) if the improperly discredited evidence were

credited as true, the ALJ would be required to find the claimant disabled on remand.'" *Id.* (citation omitted).

As discussed above, further proceedings would serve a useful purpose here, because the ALJ must address when and for how long Plaintiff's physical and mental impairments prevented him from working. (*See* Tr. 379, suggesting that Plaintiff's physical impairments may have prevented him from working after the onset date; *see also* Tr. 40-41, 413, 436, suggesting that Plaintiff's schizophrenia may not have become debilitating until the fall of 2015 or in 2016). The Commissioner will also ask the ALJ to determine if drug or alcohol use is material to Plaintiff's disability. (*See* Def.'s Br. at 18-19, citing 42 U.S.C. § 423(d)(2)(C)). For these reasons, the Court remands this case for further proceedings. *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015) ("When further proceedings are necessary to determine the onset date, it is appropriate to remand for [further] proceedings."); *Harlan v. Berryhill*, No. 1:15-cv-01893, 2017 WL 1397535, at *5 (E.D. Cal. Apr. 19, 2017) ("Because remand is appropriate for further proceedings related to the onset date, the Court offers no findings related the remaining issues identified in Plaintiff's opening brief.").

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and REMANDS this case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

DATED this 3rd day of October, 2019.

_____
STACIE F. BECKERMAN
United States Magistrate Judge